In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-2543

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LONI M. TEPIEW,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:15-cr-00250-WCG-1 — **William C. Griesbach**, *Chief Judge*.

_____

ARGUED DECEMBER 2, 2016 — DECIDED JUNE 12, 2017

_____

Before WOOD, *Chief Judge*, and EASTERBROOK and
WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Loni Tepiew entered a conditional
guilty plea to one count of assault resulting in serious bodily
injury after she confessed to beating her toddler son in the
head with her fist and shoe. On appeal, she contends that be-
cause her confession came after a warrantless entry by police
into her home, it should have been suppressed. Because we
find that the warrantless entry was justified by the emergency

aid doctrine, an exception to the Fourth Amendment's warrant requirement, we find that the district court properly denied her motion to suppress.

## I.  BACKGROUND

On a Monday morning, Officer Joshua Nickodem, a seven-year veteran of the Menominee Tribal Police Department, was summoned to a primary school in Keshena, Wisconsin. When he arrived, a school counselor gave him a picture drawn by a seven-year-old student, T.T. Beneath the drawing, T.T. wrote, "Today I feel sad. I feel sad because my mom got hit in the ribs and has a black eye. And she is hurting. And I help my mom because I help her get to the bed." After drawing the picture, T.T. told a school counselor that her one-year-old brother had also sustained an unspecified injury to the head. That counselor summarized their conversation in an email, which the school also provided to Officer Nickodem. That email stated:

> T.T. explained to me what happened this weekend. T.T. said that her moms (sic) boyfriend beat her mom up. He gave her mom a blackeye (sic) and her side hurts (ribs). T.T. ran to the boyfriends (sic) mom's house which is two houses down from there's (sic). His mom came back with T.T. running to there (sic) house. Boyfriend dad was angry. T.T. took care of her mom.

> T.T. also said the boyfriend hurts her brother
> who is 1 yr. old.[1] T.T. said that her brothers (sic)
> face was puffy Monday morning she saw him.

Although he spent nearly ten to fifteen minutes at the school, Officer Nickodem never met with T.T. Rather, armed with the information he obtained from the school counselor, he drove directly to the Menominee County Health and Human Services Department. At the department, he asked a child protective safety worker to accompany him to T.T.'s home to conduct a welfare check on the one-year-old child. Approximately five minutes later, and in separate cars, Officer Nickodem and the county employee drove at the posted speed limit and without lights and sirens to T.T.'s home, which was located fifteen minutes away on the Menominee Indian Reservation. While en route, Officer Nickodem summoned his partner, Officer Waukechon, to meet him at T.T.'s home.

Once he arrived at the property, Officer Nickodem approached the front door of the trailer where T.T. and her family lived. He could hear that the television was on, so he knocked at the door and announced his presence to see if anyone was there. After knocking, he heard fast-paced walking inside the home and saw, out of the corner of his eye, a curtain move. He knocked again. This time, he heard what sounded like a door lock. At no point, however, could Officer Nickodem see inside the home. Nor did he hear any obvious

---

[1] There is some dispute about the age of T.T.'s brother, D.T. The reports the officers received all stated that the child was one year old. The presentence report, however, refers to D.T. as a 19-month-old child. For purposes of clarity, we will refer to the child as a one-year-old, as this dispute is not material to our analysis.

signs of distress (gunshots, screams, etc.). While Officer Nickodem knocked at the front door, his partner, Officer Waukechon, stood at the back door of the home. Officer Waukechon could hear Officer Nickodem knocking and movement from inside the home. He then heard someone lock the back door.

Based upon these observations, Officer Nickodem believed that whoever was in the house did not want to speak to the police. He also knew that obtaining a warrant would take, at a minimum, an hour and a half to two hours. Concerned that the mother and one-year-old child were in the house, seriously hurt, and possibly being prevented from seeking medical attention, he called his supervisor who happened to be with the tribal prosecutor at the time. Officer Nickodem informed the tribal prosecutor that seven-year-old T.T. had reported that her mother and one-year-old brother were inside the home and injured and that he felt that he needed to enter the residence to ensure their safety. Officer Nickodem did not, however, acknowledge or tell the prosecutor that he was not certain who was in the house or if the mother and child were even there. Based upon the information she was given, the prosecutor told the officer that he did not need a warrant and should enter the home.

After speaking with the tribal prosecutor, Officers Nickodem and Waukechon returned to the door of the home. Another officer, Sergeant Kristof from the Menominee County Sheriff's Department, arrived to provide additional back up and went to the back of the residence. Once more, Officer Nickodem knocked to announce their presence and warned whomever was inside the home that he was going to knock down the door. After waiting approximately fifteen

seconds and receiving no response, he kicked down the door and he and Officer Waukechon entered the residence with their weapons drawn.

Once inside the home, Office Nickodem found T.T.'s mother, Loni Tepiew, in the bathroom with two young children. One of the children was a four-month-old infant, while the other was the one-year-old child whom T.T. had referenced to her school counselor. That one-year-old child, D.T., had what appeared to be injuries to the side of his head. Ms. Tepiew had an injury around her eye. Although Ms. Tepiew told the officers that no one else was in the residence, the officers heard movement and noises from a bedroom closet. In that closet, which was blocked by a dresser, the officers found Ms. Tepiew's boyfriend, James Johnson, hiding. Because there were active bench warrants for Mr. Johnson's arrest, the officers placed him under arrest and removed him from the residence.

In contrast, Ms. Tepiew was treated as a victim of domestic violence and was not arrested. Instead, she was asked if she needed any medical attention. To document Ms. Tepiew's injuries, the officers took photos of her. Additionally, Officer Nickodem assisted Ms. Tepiew in filling out a domestic violence worksheet.

The child protective services worker removed D.T. and the younger infant from the home, and took D.T. to seek immediate medical care. A medical examination revealed that D.T. had suffered numerous injuries. He had a fractured skull. He also had multiple bruises over his entire body and a healing tibial (shinbone) fracture. Blood tests revealed an elevated liver function, suggesting that he had suffered a mild hepatic (liver) injury. Treating medical professionals expressed their

concern that some of D.T.'s injuries were the result of older trauma. Therefore, it was recommended that D.T. receive long-term follow-up care to ensure that despite his injuries, he continued to meet neurodevelopmental milestones.

As part of the investigation into the injuries D.T. and Ms. Tepiew sustained, the officers interviewed Mr. Johnson. He denied hitting Ms. Tepiew and injuring D.T. Eleven days after the officers entered her home, however, Ms. Tepiew voluntarily underwent a polygraph examination. When confronted with inconsistencies in her statements, she admitted that she had in-fact inflicted the injuries upon D.T. using her fist and a shoe. Ms. Tepiew noted that she had struggled with alcohol and anger issues. She also reported suffering from postpartum depression. But when discussing D.T.'s injuries, she noted, "I had one bad night when I drank too much and took it out on my baby … there is [sic] much worse moms out there than me."

A federal grand jury in the Eastern District of Wisconsin returned a one-count indictment against Ms. Tepiew. The indictment charged her with assault resulting in serious bodily injury to her infant child, in violation of 18 U.S.C. §§ 113(a)(6) and 1153. Ms. Tepiew filed a motion to suppress all evidence—including her confession—obtained as a result of the warrantless entry into her home. The district court held a hearing on the motion and then requested supplemental briefing. On February 19, 2016, the district court denied the motion, finding that the officers' actions were reasonable and that the warrantless entry into the home was justified by the emergency aid doctrine. Ms. Tepiew subsequently entered a

conditional plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), reserving her right to challenge the denial of her motion to suppress, which she now does.

## II. ANALYSIS

We review a district court's decision to deny a motion to suppress under a dual standard of review. *United States v. Martin*, 807 F.3d 842, 845 (7th Cir. 2015). This means we review legal conclusions *de novo* while reviewing findings of fact for clear error. *United States v. Jackson*, 598 F.3d 340, 344 (7th Cir. 2010). On appeal, Ms. Tepiew challenges the warrantless entry into her home. She argues that because the officers acted without a warrant, the district court should have suppressed all the evidence the officers obtained against her as a result of the entry. This argument ultimately fails.

"[T]he privacy and solitude of the home are at the core of the Fourth Amendment's protection." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1245 (7th Cir. 1994) (citing *Soldad v. Cook County*, 506 U.S. 56 (1992)). A warrantless search or seizure conducted inside a home is, therefore, presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam); *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 550 (7th Cir. 2014) ("At the core of the privacy protected by the Fourth Amendment is the right to be let alone in one's home."). But, this presumption can be overcome by demonstrating that the entry falls within an exception to the warrant requirement. *Fisher*, 558 U.S. at 47.

One such exception is the exigent circumstances exception, which allows for a warrantless entry into a home "when there is a pressing need for the police to enter" but insufficient

time to secure a warrant. *Sutterfield*, 751 F.3d at 553, 557. A subset of this exception is the emergency aid doctrine, which "recognizes that a warrantless entry into the home may be appropriate when police enter for an urgent purpose *other* than to arrest a suspect or to look for evidence of a crime." *Id.* at 557 (emphasis added). Pursuant to the doctrine, warrantless entry is permitted "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *King*, 563 U.S. at 460 (quoting *Brigham City*, 547 U.S. at 403) (internal quotation marks omitted); *see also Brigham City*, 547 U.S. at 403 ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency of emergency.") (internal quotation marks omitted).

The burden rests with the government to establish that the emergency aid doctrine applies. *See United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006) (quoting *United States v. Rivera*, 248 F.3d 677, 680–81 (7th Cir. 2001)). An objective test applies and requires the court to determine whether the officer, given the facts that were known to him or her at the time, reasonably believed it was necessary to enter the home "to render assistance or prevent harm to persons or property within." *Sutterfield*, 751 F.3d at 558 (quoting *Sheik-Abdi*, 37 F.3d at 1244) (internal quotation marks omitted); *see also Fisher*, 558 U.S. at 47 (noting that the emergency aid doctrine requires that the officers only have an "objectively reasonable basis for believing that a person within [the house] is in need of immediate aid.") (internal quotation marks and citations omitted). Because this is an objective test, the officer's subjective intent and the seriousness of the crime being investigated are irrelevant to whether the doctrine applies. *Fisher*, 558 U.S. at 47; *see*

*also Brigham City*, 547 U.S. at 404 ("The officer's motivation is irrelevant."). Rather, the defining characteristic of the doctrine is urgency. *Sutterfield*, 751 F.3d at 560.

Here, Ms. Tepiew believes that the district court erred in finding that the government had met its burden of demonstrating that the warrantless entry into her home was justified. She argues that the facts here fail to establish that the emergency aid doctrine applies for two main reasons. First, there was no evidence of an ongoing emergency because the officers were responding on a Monday to an unverified complaint by a seven-year-old that there had been an incident at some unspecified point the weekend before. The officer's failure to even interview her daughter, she contends, undermines the government's position that there was an objectively reasonable basis for believing that T.T.'s statements were credible and that there was an urgent need for entry into her home.

Second, she argues that the officers failed to behave in a way that demonstrated that they believed there was an emergency. She notes that instead of driving directly to the home with lights and sirens blaring, Officer Nickodem first drove to the county's child protective services department. After spending five minutes there to collect a child protective services worker, he then drove fifteen minutes at the posted speed limit to her home. Upon arrival, he did not immediately proceed to knock down the door. Instead he made a telephone call to his supervisor and the tribal prosecutor and then waited for back up to arrive before proceeding to enter the home. Additionally, because the officers did not even know who was inside the home, Ms. Tepiew asserts that they could not have reasonably believed that their entry was required to

provide emergency aid. Therefore, she believes that the district court erred in denying her motion to suppress. But Ms. Tepiew's arguments are not persuasive.

Ms. Tepiew's arguments fail to take into account the totality of the circumstances that the officers faced. The officers were given a drawing that stated, in the present tense, that T.T.'s mother "*is* hurting." They were also presented with a report that a one-year-old child had sustained some sort of unspecified head injury. The injury was significant enough that a seven-year-old took note, telling her school counselor that D.T.'s head was "puffy" just that morning. And, one cannot deny that a one-year-old is a particularly vulnerable victim—he cannot speak, he cannot protect himself, and he certainly cannot seek help on his own. In light of the report they received, it was objectively reasonable for the officers to be concerned about D.T.'s well-being and believe that there was an urgent need to provide care.

But that was not the only information upon which the officers based their decision to enter the home without a warrant. Although they did not race to the home with their lights and sirens blaring, they did make various and important observations upon their arrival. The officers encountered someone within the home who was actively trying to avoid speaking with the officers who were there to check on the child and his mother's well-being. Whoever was in the home was not responding to their inquiries, but instead locked the door to ensure that no one could enter, and perhaps also that no one could leave.

Ms. Tepiew contends that the proper course of action when faced with these circumstances was for the officers to obtain a warrant. The officers could have done so quickly, she

states, by obtaining a warrant telephonically. But, this argument fails to take into account the process for obtaining a warrant on the Menominee Indian Reservation. Officer Nickodem testified that based upon his own experience, doing so would have taken at "at a minimum" an hour and a half to two hours, as he would have had to find a judge of the Court of Indian Offenses to issue the warrant. Despite Ms. Tepiew's arguments to the contrary, the Menominee Nation's Constitution and Bylaws do not explicitly permit for warrants to be obtained telephonically. *See* Constitution & Bylaws Art. IX § 2(d) (Menominee Indian Tribe of Wis.). Therefore, based upon the totality of the circumstances faced by the officers at the time they entered the home without the warrant, it was objectively reasonable to believe that their entry was necessary to render emergency aid to D.T. As such, the warrantless entry into the home falls within the emergency aid doctrine, and the district court properly denied the motion to suppress.

### III. CONCLUSION

We AFFIRM the district court's denial of Ms. Tepiew's motion to suppress.