In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 18-1668

BARRY DAYTON,

*Plaintiff-Appellant,*

*v.*

OAKTON COMMUNITY COLLEGE, *et al.,*

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Northern District of Illinois.
No. 1:16-cv-06812 — **Matthew F. Kennelly**, *Judge.*

---

ARGUED SEPTEMBER 27, 2018 — DECIDED OCTOBER 11, 2018

---

Before FLAUM, MANION, and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Traditionally, Oakton Community College employed retired state employees as part-time and adjunct faculty. But in November 2014, Oakton changed its hiring practices so that as of July 1, 2015, Oakton would no longer employ retired state employees if they were also beneficiaries of the State University Retirement System. This decision affected eighty-four individuals, including Barry Dayton. As a result, Dayton filed this lawsuit, on behalf of himself

and a certified class of similarly-situated part-time and adjunct faculty, against Oakton and several individuals who were involved in adopting the policy,[1] alleging claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623; 42 U.S.C § 1983; and Illinois law. The district court granted defendants' motion for summary judgment. We affirm.

## I. Background

### A. Factual Background[2]

Oakton Community College participates in the State University Retirement System ("SURS"), as provided by the Illinois Pension Code. *See* 40 Ill. Comp. Stat. 5/15-101 *et seq.* Eligible employees make contributions to SURS until they retire, at which point they may begin collecting a retirement annuity from SURS. Once an annuitant retires and begins receiving benefits, the annuitant may return to work, but the annuitant is subject to earnings limitations under SURS. *See id.* § 5/15-139(b).

In 2012, the Illinois legislature amended the SURS return-to-work provisions to impose a penalty on covered employers that employ "affected annuitant[s]." *Id.* § 5/15-139.5(e). Since the enactment, the legislature has refined the definition of an affected annuitant several times. When Oakton changed its

---

[1] Dayton named the following individuals as defendants: Margaret Lee, Oakton's president at the time the policy was enacted; Joianne Smith, Oakton's current president and member of the president's advisory council at the time the policy was enacted; and Michael Anthony, Karl Brooks, Maya Evans, Tom Hamel, Collette Hand, Bonnie Lucas, and Mum Martens, members of the advisory council at the time the policy was enacted.

[2] The facts are undisputed except where otherwise noted.

hiring policy in November 2014, the second version of the statute, which was effective from November 19, 2013 to May 31, 2015, was the operative version; it provided:

> A person receiving a retirement annuity from [SURS] becomes an 'affected annuitant' on the first day of the academic year following the academic year in which the annuitant first meets the following condition: … While receiving a retirement annuity …, the annuitant was employed on or after August 1, 2013 by one or more [SURS-covered] employers … and received or became entitled to receive during an academic year compensation for that employment in excess of 40% of his or her highest annual earnings prior to retirement.[3]

*Id.* § 5/15-139.5(b). The third version of the statute took effect on June 1, 2015, which was one month before Oakton began enforcing its policy, and it remained valid until December 7, 2017. Under that version, an employee could also become an affected annuitant if "[t]he annuitant received an annualized retirement annuity … of at least $10,000." *Id.* § 5/15-139.5(b)(3). The fourth and current version of the statute, which went into effect on December 8, 2017, includes both conditions.

Covered employers who employ an affected annuitant must make a SURS contribution equal to "12 times the

---

[3] The statute exempts the following sources of compensation from the limitation: "compensation paid from federal, corporate, foundation, or trust funds or grants of State funds that identify the principal investigator by name." 40 Ill. Comp. Stat. § 5/15-139.5(b).

amount of the gross monthly retirement annuity payable to the annuitant for the month in which the first paid day of that employment in that academic year occurs." *Id.* § 5/15-139.5(e).

Before the legislature amended the statute, Oakton often employed individuals who had retired and who were receiving a SURS retirement annuity. Following the amendment, Oakton attempted to comply with the new requirements by monitoring the earnings of the annuitants it employed throughout the 2013–2014 academic year. Despite these efforts, a monitoring error led Oakton to employ affected annuitants inadvertently; the mistake cost Oakton approximately $75,000 in penalties.

When a human resources specialist discovered the oversight, she informed Oakton's chief human resources officer, Mum Martens. In turn, Martens advanced the issue to Oakton's then-president, Margaret Lee. While evaluating how to respond to this situation, the president's advisory council considered the fact that some annuitants Oakton employed were not at risk of becoming affected annuitants under the second version of the statute (because there were caps on adjunct compensation and on the number of "lecture hour equivalents" adjunct faculty could teach per semester). But, after weighing the risk that another monitoring error could cost the college thousands of dollars, the council came to the view that it would be fiscally irresponsible to employ any annuitant, regardless of whether she was likely to become an affected annuitant. Ultimately, Lee decided that Oakton should abandon employing all SURS annuitants.

In November 2014, Oakton announced its decision to no longer employ SURS annuitants effective July 1, 2015.[4] Martens sent an e-mail to all annuitants Oakton employed, explaining that the decision was based on "challenges" Oakton experienced with monitoring annuitants' earnings and "concerns" Oakton had about SURS's administration and enforcement of the new statutory requirements. Several nonaffected annuitants asked Oakton to reconsider the decision and filed grievances. Oakton did not rescind its policy.

In total, Oakton refused to rehire approximately eighty-four annuitants because of the policy. Each of those individuals was over the age of fifty-five. Although Oakton continued to employee individuals over the age of forty after the policy went into effect, those individuals were not annuitants.

### B. Procedural Background

Approximately one year after filing a charge with the Illinois Department of Human Rights, Dayton filed a complaint with the United States District Court for the Northern District of Illinois, bringing claims under the ADEA, § 1983, and Illinois law.

Two other annuitants, Daniel Filipek and Donald Krzyzak, also filed individual suits against Oakton, alleging violations of the ADEA and the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/2-102. The district court consolidated the three lawsuits, and on May 17, 2017, it granted plaintiffs' motion for collective and class certification. The certified class was defined as: "all part-time and adjunct faculty who were denied

---

[4] The policy had one exception: Oakton would still employ annuitants if the president determined that there was a specific and unique need to employ that individual.

employment at Oakton Community College as the result of its policy not to employ or reemploy State Universities Retirement System annuitants and who are not 'affected annuitants.'"

On February 27, 2018, the district court granted defendants' motion for summary judgment. Dayton appealed; Filipek and Krzyzak did not.

## II. Discussion

We review a district court's grant of a motion for summary judgment de novo, interpreting all facts and drawing all reasonable inferences in favor of the nonmoving party. *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016) (citing Fed R. Civ. P. 56(a)). And summary judgment is not appropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We may affirm the grant of summary judgment on any ground supported in the record, so long as the parties adequately presented the issue in the district court and the nonmoving party had an opportunity to contest it. *O'Brien*, 900 F.3d at 928.

### A.  The ADEA

The ADEA prohibits taking adverse actions against employees who are forty years old or older because of their age. 29 U.S.C. §§ 623(a), 631(a). To prevail on a disparate-impact claim, a plaintiff must demonstrate that a "specific, facially *neutral* employment practice caused a significantly disproportionate adverse impact based on age." *Carson v. Lake County*,

865 F.3d 526, 536 (7th Cir. 2017) (citation omitted). Unlike disparate-treatment claims, disparate-impact claims do not require proof of discriminatory motive.[5] *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

If a plaintiff establishes a prima facie case for a disparate-impact claim, the defendant may avoid liability by showing that the policy was based on a reasonable factor other than age ("RFOA"). *O'Brien*, 900 F.3d at 928 (citing 29 U.S.C. § 623(f)(1)). To establish this affirmative defense, a defendant must show that the disparate impact was "reasonably designed to further or achieve a legitimate business purpose" and that it was "administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been known, to the employer." *Id.* at 931 (quoting 29 C.F.R. § 1625.7(e)(1)). When courts assess whether an RFOA exists, they need not consider whether there existed alternative ways the employer could have achieved its goals without causing a disparate impact on a protected class. *Id.* As such, the affirmative defense is a "relatively light burden" for employers to carry. *Id.* (citation omitted).

The district court found that Oakton's decision not to employ any annuitants was "likely" sufficient to establish a prima facie case for disparate impact under the ADEA; but, it also determined that a reasonable jury would be compelled to conclude that Oakton's decision was based on an RFOA.

---

[5] Plaintiffs did not bring a disparate-treatment claim, and they do not raise that theory of liability on appeal; the district court addressed the disparate-treatment theory of liability in its decision because Filipek and Krzyzak raised it in their companion cases.

Plaintiffs maintain that the court's reasoning was flawed. First, plaintiffs contend that the district court failed to properly place the burden on Oakton to prove that its policies did not have a disparate impact on a protected class. Second, plaintiffs say the district court did not engage in a fact-intensive inquiry or otherwise discuss Oakton's proffered factors in light of the Equal Employment Opportunity Commission's ("EEOC") regulations. And third, plaintiffs assert that the district court applied the wrong standard of review, requiring only a rational basis rather than the heightened standard required by the ADEA and the EEOC's regulations.

### 1. *The Burden of Proof*

First, to support their argument that Oakton had the burden to prove its policies do not have a disparate impact, plaintiffs rely on the Court's opinions in *Smith v. City of Jackson*, 544 U.S. 228 (2005), and *Meachum v. Knolls Atomic Power Laboratory*, 554 U.S. 84 (2008). Plaintiffs misinterpret those cases.

In *Smith*, the Court held that the ADEA authorizes disparate-impact claims. 544 U.S. at 232. Drawing on a disparate-impact case under Title VII, *Smith* explained that to state such a claim under the ADEA, a plaintiff must identify "'the *specific* employment practices that are allegedly responsible for any observed statistical disparities,'" and that "it is not enough to simply … point to a generalized policy that leads to such an impact." *Id.* at 241 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)). The Court further concluded that an employer can avoid liability under the ADEA so long as its decision was "based on 'a reasonable facto[r] other than age' that responded to the [employer's] legitimate goal." *Id.* at 242 (alteration in original) (citation omitted). This is true regardless of whether "there may have been other reasonable ways

for the [employer] to achieve its goals" because unlike Title VII's business necessity test, which asks whether alternatives that do not result in a disparate impact are available for the employer to achieve its goals, the ADEA's reasonableness inquiry includes "no such requirement." *Id.* at 243.

*Meacham* discussed and applied *Smith*. The defendant in *Meacham* argued that the RFOA should be read as an "elaboration of an element of liability." 554 U.S. at 95. The Court disagreed. It explained:

> [I]n [*Smith*], we made it clear that in the typical disparate-impact case, the employer's practice is "without respect to age" and its adverse impact (though "because of age") is "attributable to a nonage factor"; so action based on a "factor other than age" is the very premise for disparate-impact liability in the first place, not a negation of it or a defense to it. The RFOA defense in a disparate-impact case, then, is not focused on the asserted fact that a non-age factor was at work; we assume it was. The focus of the defense is that the factor relied upon was a "reasonable" one for the employer to be using. Reasonableness is a justification categorically distinct from the factual condition "because of age" and not necessarily correlated with it in any particular way: a reasonable factor may lean more heavily on older workers, as against younger ones, and an unreasonable factor might do just the opposite.

*Id.* at 96. The Court emphasized that the business necessity test has "no place in ADEA disparate-impact cases" because

it would be senseless to require a showing that alternative practices would have a less discriminatory effect "when everyone knows that the choice of a practice relying on a 'reasonable' non-age factor is good enough to avoid liability." *Id.* at 97, 99.

In short, *Meacham* and *Smith* hold that the burdens of proof and persuasion fall on the employer as to the RFOA, but that employers need not defend their selection of one policy over a narrower policy. Thus, neither *Smith* nor *Meacham* support plaintiffs' argument that the district court should have required defendants to prove that Oakton's policy did not have a disparate impact on older employees. Put simply, the ADEA and the cases interpreting it make clear that a policy may have a disparate impact on older workers as long as the employer shows that the policy was based on an RFOA. The district court applied the appropriate burden of proof here.

### 2. *The EEOC Regulations*

Next, plaintiffs point to the EEOC regulation defining reasonable factor other than age. It states, "[An RFOA] is a non-age factor that is objectively reasonable when viewed from the position of a prudent employer mindful of its responsibilities under the ADEA under like circumstances." 29 C.F.R. § 1625.7(e)(1). Whether an RFOA exists "must be decided on the basis of all the particular facts and circumstances surrounding each individual situation." *Id.* To establish the defense, "an employer must show that the employment practice was both reasonably designed to further or achieve a legitimate business purpose and administered in a way that reasonably achieves that purpose in light of the particular facts and circumstances that were known, or should have been

known, to the employer." *Id.* The regulation provides a non-exhaustive list of considerations that may be relevant:

> (i) The extent to which the factor is related to the employer's stated business purpose;
>
> (ii) The extent to which the employer defined the factor accurately and applied the factor fairly and accurately, including the extent to which managers and supervisors were given guidance or training about how to apply the factor and avoid discrimination;
>
> (iii) The extent to which the employer limited supervisors' discretion to assess employees subjectively, particularly where the criteria that the supervisors were asked to evaluate are known to be subject to negative age-based stereotypes;
>
> (iv) The extent to which the employer assessed the adverse impact of its employment practice on older workers; and
>
> (v) The degree of the harm to individuals within the protected age group, in terms of both the extent of injury and the numbers of persons adversely affected, and the extent to which the employer took steps to reduce the harm, in light of the burden of undertaking such steps.

*Id.* § 1625.7(e)(2). Just as "[n]o specific consideration or combination of considerations need be present for a differentiation to be based on reasonable factors other than age," it is also true that "the presence of one of these considerations

[does not] automatically establish the defense." *Id.*
§ 1625.7(e)(3).[6]

Plaintiffs say the district court did not perform a fact-in-
tensive inquiry, and if it had, the district court would have
found that plaintiffs raised disputes of material fact as to the
regulation's considerations. First, plaintiffs argue Oakton's
policy was not reasonable because the decision was not re-
lated to Oakton's stated business purpose—avoiding a SURS
penalty—as the policy excluded nonaffected annuitants. *See
id.* § 1625.7(e)(2)(i). Second, plaintiffs argue that Oakton's pol-
icy was not reasonable because Oakton did not address the
adverse impact on the affected class; instead, the architect of
the policy prioritized equity between retirees over compliance
with the new requirements (knowing that not all retirees were
affected annuitants). *See id.* § 1625.7(e)(2)(iv). Finally, plain-
tiffs argue that Oakton's policy was not reasonable because
Oakton did not attempt to reduce the harm to the class, as it
abandoned an effective monitoring system in favor of not
monitoring at all. *See id.* § 1625.7(e)(2)(v).

Defendants challenge the notion that the district court was
required to rely on the regulation's considerations. But, even
if that type of analysis was required, defendants believe the

---

[6] In the EEOC's final rulemaking, it emphasized that "the RFOA determi-
nation involves a fact-intensive inquiry," and that "[t]he RFOA defense
necessarily requires more than merely a showing that the employer's ac-
tion was not irrational or not arbitrary"; otherwise, the effect would be to
"nullify" *Smith* and *Meacham* and to "undermine the intent of Congress to
address 'the consequences of employment practices, not simply the moti-
vation.'" Disparate Impact and Reasonable Factors Other Than Age Under
the Age Discrimination in Employment Act, 77 Fed. Reg. 19,080-02, 19,082,
19,084–85 (March 30, 2012) (quoting *Smith*, 544 U.S. at 238–39).

district court complied with the regulation because plaintiffs raised similar arguments about those considerations at summary judgment, and the district court considered (but rejected) those arguments. We agree.

Specifically, the district court acknowledged plaintiffs' evidence that Oakton knew that a significant number of annuitants would not be affected annuitants, and that the inadvertent employment of an affected annuitant (and subsequent penalty) was only caused by a monitoring error by one human resources specialist. The district court agreed with plaintiffs that such evidence showed that a blanket ban on employing annuitants was not the only option available to Oakton. However, the district court properly determined that such evidence did not preclude summary judgment for defendants. Oakton is not required to implement a narrowly-tailored policy; it is sufficient that it adopted a policy that was based on an RFOA.

The district court also discussed plaintiffs' evidence of Oakton's chief human resource officer Martens's statement that Oakton opted not to distinguish between annuitants and affected annuitants because of equitable considerations. The district court did not agree with plaintiffs that the statement was effectively an admission that Oakton did not want to employ people in a certain age range. Rather, it understood the statement as consistent with Oakton's overarching explanation and evidence that it sought to avoid any risk of a repeat mistake.

In an effort to challenge the credibility of defendants' proffered reasons for the policy, plaintiffs attempt to create a dispute of fact about the extent of "the burden" defendants faced in monitoring annuitants. For example, plaintiffs assert that

Oakton already monitors the number of hours its employees
work to ensure compliance with the Affordable Care Act
("ACA")—the implication being that monitoring for SURS
compliance is not so much more burdensome to warrant the
policy change. While it is true that the district court did not
address this specific point, Martens's deposition testimony re-
garding the ACA does not controvert the evidence about de-
fendants' reasons for adopting a policy to no longer employ
annuitants. Indeed, as Oakton's then-president Lee stated at
her deposition, the monitoring calculations could be complex,
and the risk of a mistake was too great:

> Q. Counsel was asking you that … you now
> know that for a fact that there [are] certain indi-
> viduals who the college has made a decision to
> no longer employ indefinitely based on their
> status as a SURS annuitant who would never
> cause a penalty to the college, correct?
>
> A. No. Not necessarily.
>
> Q. You haven't heard that today?
>
> A. No. Well, there are different contributing fac-
> tors. For example, if we look at the 10,000 ex-
> emption that came in in [*sic*] sometime Decem-
> ber or January, then we had instances and ex-
> amples of individuals who were very close to
> that number like 9,900 something and because
> as an annuitant, you receive an annual cost of
> living adjustment that was 3 percent, they could
> effectively go over that 10,000 and we would be
> aware of that and then we would receive a pen-
> alty as a result. So there was [*sic*] still risk factors

> that were involved that from my perspective I
> didn't feel the college should take moving for-
> ward.
>
> Q. What about the individuals who make so
> much money that the 40 percent could never be
> reached based upon the terms of the Collective
> Bargaining Agreement?
>
> A. From my perspective, it was an equity issue
> so if we were looking at the nonreemployment
> of SURS annuitants, to me that meant all sorts of
> annuitants.

A reasonable factfinder could not infer from this evidence that defendants' reasons for adopting the policy were not credible. The mere fact that the risk of a several-thousand-dollar penalty loomed large is enough, under these circumstances, to require a factfinder to conclude that defendants based the policy on an RFOA.

In sum, although the district court did not cite or expressly refer to each of the regulation's considerations, the district court did not run afoul of the regulation. It performed a fact-intensive inquiry and found that Oakton adopted the policy to prevent the mistaken employment of an affected annuitant and the resulting penalty. Based on this rationale, the district court correctly concluded that a reasonable jury would be compelled to find that Oakton's reason was an RFOA.[7]

---

[7] Plaintiffs also fault the district court for "overread[ing] and misapply[ing]" our decision in *Carson* "to provide a blanket defense where pension status is used to support an RFOA defense." *See* 865 F.3d 526. According to plaintiffs, *Carson* is distinguishable from this case because there, the

### 3.  *The Standard of Review*

In plaintiffs' view, the reason Oakton proffered for its policy was "nothing more than speculation unsupported by evidence or empirical data." They maintain that the defense could only survive rational-basis review, and because the district court accepted this reason, plaintiffs conclude that the district court must have used the wrong standard in reviewing defendants' proffered reason.

We disagree with the premise of this argument. First, Oakton's concern was not speculative. Oakton had already tried the strategy of employing annuitants with the intention of monitoring their earnings to avoid receiving a SURS penalty, and that strategy failed. There is no evidence that the circumstances have changed in a way that would guarantee Oakton would not make the same mistake again if it continued to employ annuitants. That is proof positive that the risk of a repeat mistake remains. More fundamentally, the district court did not merely defer to defendants' proffered reasons for adopting the policy. Rather, it required defendants to prove that Oakton's policy "was, in fact, based on reasonable factors

---

employer only terminated the employees necessary to comply with federal law; whereas here, Oakton terminated employees who were not impacted by the new requirements and did not affect Oakton's compliance with the new requirements. Here, though, defendants were not seeking mere compliance with federal law. The reason defendants adopted the policy was to avoid any risk of penalties, and Oakton only refused to rehire individuals whose employment raised that risk. The district court's discussion of *Carson* was appropriate.

other than age." That was the appropriate standard to apply, and defendants met that standard.[8]

We affirm the district court's decision to grant summary judgment in favor of defendants on plaintiffs' ADEA claim.

### B. Section 1983

"Section 1983 does not create substantive rights." *Levin v. Madigan*, 692 F.3d 607, 611 (7th Cir. 2012). Rather, § 1983 "operates as a 'means for vindicating federal rights conferred elsewhere.'" *Id.* (quoting *Paudula v. Leimbach*, 656 F.3d 595, 600 (7th Cir. 2011)). Since there is no ADEA violation here, there are no federal rights for plaintiffs to vindicate under § 1983. We affirm the district court's decision to award defendants summary judgment on this claim.

### C. Retaliatory Discharge

Retaliatory discharge is a "limited and narrow tort" in Illinois. *Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 492 (Ill. 1998). To state such a claim, plaintiffs must show that they were discharged in retaliation for their activities, and that

---

[8] Plaintiffs cite *Kimel v. Florida Board of Regents* for the proposition that "the ADEA standard and the rational basis test are 'significantly different.'" 528 U.S. 62, 87 (2000) (quoting *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 421 (1985)); *see also id.* at 86 ("The [ADEA] … prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the … rational basis standard."). *Kimel* is not helpful to plaintiffs' argument because the district court properly analyzed plaintiffs' claim, determining that defendant's policy was based on a "reasonable factor other than age." Thus, the district court did not use a rational-basis test.

their discharge "violates a clear mandate of public policy." *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013) (quoting *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009)).

Defendants assert that we lack jurisdiction over plaintiffs' retaliatory-discharge claim and, in any event, that plaintiffs cannot establish a prima facie case for retaliatory discharge.

Turning first to the timeliness issue, we note that the tort of retaliatory discharge is subject to the one-year statute of limitations under the Illinois Tort Immunity Act, 745 Ill. Comp. Stat. 10/8-101(a). *See Halleck v. County of Cook*, 637 N.E.2d 1110, 1113 (Ill. App. Ct. 1994). According to defendants, plaintiffs' claims accrued in November 2014, when they first learned about Oakton's policy. Since plaintiffs did not file a complaint alleging retaliatory discharge until June 29, 2016, defendants' argument continues, plaintiffs exceeded the one-year statute of limitations.

Plaintiffs contend that their claim is timely because actual termination is a prerequisite for a retaliatory-discharge claim under Illinois law. So, plaintiffs maintain that their action could not have accrued until a final decision was made about their employment on July 1, 2015, less than a year prior to the date of their complaint. We agree.

In *Thomas v. Guardsmark, Inc.*, we considered whether an employee was effectively discharged when he was indefinitely suspended, and in turn, whether the six-month contractual limitations period began to run at the time of the suspension. 381 F.3d 701 (7th Cir. 2004). We started with a general statement of Illinois law that "a limitations period begins to run when facts exist that authorize one party to maintain an

action against another." *Id.* at 707 (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003)). We also recognized that there is no claim for retaliatory-constructive discharge in Illinois; instead, an actual termination is required to state a retaliatory-discharge claim. *Id.* at 707–08 (citing cases). Therefore, we held that the plaintiff's claim was not time-barred because his suspension was not equivalent to a discharge. *Id.* at 708.

Though *Thomas* considered a limitations period from an employment agreement, and not the one-year limitations period from the Illinois Tort Immunity Act, it makes clear that under Illinois law, a retaliatory-discharge claim accrues at the time of termination. Thus, plaintiffs' retaliatory-discharge claim is not time-barred under the Tort Immunity Act.

Nevertheless, plaintiffs' claim for retaliatory discharge cannot survive summary judgment. They did not present sufficient evidence to show either that they were terminated in response to their participation in SURS or that their termination violated public policy.

Plaintiffs contend that their "participation in SURS was the *sine qua non* for their termination." They argue that they raised material facts showing that Oakton's policy was directly based on the class members' exercise of their right to collect retirement benefits from SURS. They point to internal communications about "questions from existing annuitants who [were] willing to suspend their annuity in order to return to teaching," as evidence of members of the class being forced to choose between employment and receiving pension contributions.

In response, defendants argue that the undisputed evidence showed that when Oakton decided to discontinue

plaintiffs' employment, they had already chosen to retire and to collect their pension benefits. Consequently, Oakton could not have forced plaintiffs to choose between retirement or continued employment; plaintiffs had already chosen the former over the latter.

Defendants are correct. As the district court concluded, "plaintiffs have produced no evidence from which a reasonable factfinder could conclude that they were discharged in retaliation for their participation in SURS." Indeed, the internal communications plaintiffs cite do not show what plaintiffs claim. The e-mails are evidence that employees were weighing their options after the policy announcement, and evidence that Oakton was maintaining its default position that it would not employ annuitants, even if the annuitants stopped receiving contributions. The e-mails are not proof of Oakton making plaintiffs choose between receiving benefits and continuing employment. Rather, they demonstrate the opposite: the absence of choice.

Plaintiffs also allege that their termination violated article XIII, § 5 of the Illinois Constitution, which provides that "[m]embership in any pension or retirement system of the State … shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." We understand this to be an argument that plaintiffs' discharge constituted a violation of public policy (even though plaintiffs' briefs never mention "public policy"). In any event, we disagree with plaintiffs' reading of § 5.

The purpose of § 5 is to protect employees' pension from legislative abrogation. *See Kastel v. Winnetka Bd. of Educ., Dist. 36*, 946 F. Supp. 1329, 1342–43 (N.D. Ill. 1996). It does not protect an annuitant's right to work at a SURS-covered employer

after retirement. As the district court concluded, "[b]ecause Oakton's decision does not impair the plaintiffs' pension rights, and the Illinois Constitution does not protect SURS annuitants from having to choose between collecting an annuity and continuing part-time, post-retirement employment, plaintiffs' state constitutional claim fails as a matter of law."[9]

Lacking any cases discussing retaliation for obtaining pension benefits under the Illinois Constitution, plaintiffs offer an ERISA case discussing "this exact theory under § 510 of ERISA." *See Kross v. W. Elec. Co.*, 701 F.2d 1238, 1242–43 (7th Cir. 1983) (concluding that "[plaintiff's] allegations state a claim under § 510 of ERISA since such allegations, if proven, might establish that [plaintiff] was discharged for the purpose of interfering with the attainment of a right under the insurance plans."). But, Oakton's employment decision did not interfere with the annuitants' right or ability to collect their pension benefits as the employer's decision in *Kross* did. Oakton's decision only interfered with annuitants' ability to continue to work for Oakton in their retirement. *Kross* does not advance plaintiffs' claim.

As plaintiffs do not identify any authority that would entitle them to simultaneously receive an annuity and to engage

---

[9] The district court properly rejected plaintiffs' reliance on *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353 (Ill. 1978). In that case, the employer attempted to discourage the employee from filing a worker's compensation claim and then fired the employee when she followed through on the claim. Here, by contrast, there is no evidence that defendants attempted to discourage plaintiffs before they accepted benefits; there is only evidence that a policy change affected employees who had previously elected to take benefits.

in post-retirement employment, Oakton's alleged interference is not actionable. Defendants are entitled to judgment on plaintiffs' retaliatory-discharge claim.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.