In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 20-1295

SALLY GAETJENS,

*Plaintiff-Appellant,*

*v.*

CITY OF LOVES PARK, et al.,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 16-cv-50261 — **John Robert Blakey**, *Judge.*

———————————

ARGUED MAY 27, 2021— DECIDED JULY 13, 2021

———————————

Before KANNE, SCUDDER, and KIRSCH, *Circuit Judges.*

KANNE, *Circuit Judge.* Plaintiff Sally Gaetjens sued various local government officials for entering and condemning her home and confiscating her thirty-seven cats, all without a warrant. She's right that the Fourth Amendment would usually prohibit such conduct. But emergencies breed exceptions—and this case is littered with emergencies.

Namely, Gaetjens went missing in action, and Defendants had reason to believe that she was experiencing a medical emergency. Plus, when Defendants attempted to check her home, they deemed it so noxious that it posed a public-safety risk. Given these exigencies, the Fourth Amendment did not require Defendants to wait for judicial approval before acting. We thus affirm the decision of the district court granting summary judgment to Defendants.

## I. BACKGROUND

The following facts are undisputed and stated in the light most favorable to Gaetjens as the nonmoving party. *Wonsey v. City of Chicago*, 940 F.3d 394, 399 (7th Cir. 2019) (citing *Dayton v. Oakton Cmty. Coll.*, 907 F.3d 460, 465 (7th Cir. 2018)).

Gaetjens bred cats in her home in Loves Park, Illinois. On December 4, 2014, she visited her doctor and was told to go to the hospital because of high blood pressure. Later that day, the doctor couldn't locate Gaetjens, so she phoned Rosalie Eads (Gaetjens's neighbor who was listed as her emergency contact) to ask for help finding her. Eads called Gaetjens and knocked on her front door but got no response.

The next day, Gaetjens was still missing, so Eads called the Loves Park police and told them that Gaetjens might be experiencing a medical emergency. Defendant Sergeant Allton and another officer went to Gaetjens's Loves Park home but could not see anyone inside. They did, though, notice packages on the porch, untended garbage, and a full mailbox.

The police then met up with Eads, who said she had a key to the Loves Park house and confirmed what she had said on the phone. With these facts before them, the police asked Eads for the key so that they could enter to see if Gaetjens was in

danger. Eads obliged but also said that she thought perhaps Gaetjens was at her other home in Rockford.

The police went into the home but didn't get far. After making it about ten feet, intense odors forced them back out. Allton described the smell as a mix of urine, feces, and maybe a decomposing body.

The police then called on the Loves Park Fire Department to enter the home with breathing devices. Defendant Fire Chief Foley arrived first, and Allton told him the whole tale. So Foley approached the cracked front door for himself and got a whiff of something that could "gag a maggot." Foley thus temporarily condemned the home as not fit for human or animal habitation by placing a placard on the front door that read: "CONDEMNED[.] This Structure is Unsafe and Its use or occupancy has been prohibited by the code administrator. It shall be unlawful for any person to enter such structure except for the purpose of making the required repairs or removal."

More firefighters soon arrived and went into the home to look for Gaetjens. But instead of Gaetjens, they found thirty-seven cats.

At that point, the responders summoned Winnebago County Animal Services to round up the cats because Gaetjens was not allowed inside the condemned house to care for the clowder herself. Some of the felines proved more difficult to catch than others. In particular, the male stud, Calaio, looked ready to attack the workers. So they pulled out metal "cat grabbers" to trap him.

In the end, Animal Services impounded the cats from December 4 to December 13, 2014. Sadly, four cats, including Calaio, died as a result of the impoundment.

Based on these events, Gaetjens—who unbeknownst to the officers had been in the hospital all along—sued the City of Loves Park, Winnebago County, and various employees of each under 28 U.S.C. § 1983. Relevant to this appeal, she alleged that the individual Defendants (Allton, Foley, and three Animal Services employees) violated her Fourth Amendment rights by (1) entering her home, (2) condemning her home, and (3) seizing her cats. She also alleged that the City of Loves Park and Winnebago County are liable for these violations under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).

The district court granted summary judgment to all Defendants on all claims. Gaetjens now appeals.

## II. ANALYSIS

We review a district court's grant of summary judgment *de novo*. *Wonsey*, 940 F.3d at 399 (citing *Dayton*, 907 F.3d at 465). In this case, the district court determined that Gaetjens's Fourth Amendment claims fail because the individual defendants are entitled to qualified immunity. We agree that Gaetjens's claims fail, but for a more basic reason—the individual defendants did not violate the Fourth Amendment.

The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection exists in both the criminal and civil contexts. *Soldal v. Cook County*, 506 U.S. 56, 67 (1992).

"[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999); *Katz v. United States*, 389 U.S. 347, 357 (1967)). "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). But this "warrant requirement is subject to certain exceptions." *Id.* (citing *Flippo*, 528 U.S. at 13; *Katz*, 389 U.S. at 357).

One such exception arises when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search [or seizure] is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)) (citing *Johnson v. United States*, 333 U.S. 10, 14–15 (1948)). In these situations, one principle governs—"[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id.* at 392–93 (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

To determine whether an exigency permitted a warrantless search or seizure in a home, we "conduct[] an objective review, analyzing whether the government met its burden to demonstrate that a reasonable officer had a 'reasonable belief that there was a compelling need to act and no time to obtain a warrant.'" *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006) (quoting *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995)). This objective review looks at "the totality of facts and circumstances 'as they would have appeared to a reasonable person *in the position of the … officer*—seeing what he saw, hearing what he heard.'" *Bogan v. City of Chicago*, 644 F.3d 563,

572 (7th Cir. 2011) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)).

The exigent circumstances doctrine applies equally to warrantless searches of a home, seizures of a home, and seizures of private property within a home. *See Sutterfield v. City of Milwaukee*, 751 F.3d 542, 558 (7th Cir. 2014); *United States v. Shrum*, 908 F.3d 1219, 1231 (10th Cir. 2018) ("[T]he warrantless seizure of a home … 'is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of "exigent circumstances."'" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971)) (citing *Brigham City*, 547 U.S. at 403)); *Siebert v. Severino*, 256 F.3d 648, 657 (7th Cir. 2001) ("Exigent circumstances may justify a warrantless seizure of animals." (citing *DiCesare v. Stuart*, 12 F.3d 973, 977 (10th Cir. 1993))).

Here, all parties agree that Allton "searched" the Loves Park home by entering it to look for Gaetjens. Likewise, all agree that Foley "seized" the Loves Park home by placing a condemnation placard on it and that the Animal Services workers "seized" Gaetjens's cats by capturing them. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."). Finally, all agree that Defendants did not obtain warrants or any other judicial or administrative approval before conducting these searches and seizures.

So, to satisfy the Fourth Amendment, Defendants' warrantless searches and seizures needed to fall into an exception to the warrant requirement. They all did—each was justified by an exigent circumstance.

First, Allton (who searched the house) had an objectively reasonable basis for believing that Gaetjens was experiencing a medical emergency that required immediate action. Second, Foley (who seized the house) had an objectively reasonable basis on which to believe that the Loves Park home posed a safety threat that required immediate attention. Third, the Animal Services employees (who seized the cats) reasonably determined that the cats were in imminent danger because they could not be cared for in the home.

Last, because none of the individual defendants violated Gaetjens's Fourth Amendment rights, her *Monell* claims fail as well.

*A. The Home Entry*

In an exigent circumstance often referred to as an "emergency-aid" situation, government officials may enter a home without a warrant "to 'render assistance or prevent harm to persons or property within.'" *Sutterfield*, 751 F.3d at 558 (quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994)). In a recent concurring opinion, Justice Kavanaugh provided "[a] few (non-exhaustive) examples [that] illustrate" "some heartland emergency-aid situations." *Caniglia v. Strom*, 141 S. Ct. 1596, 1604 (2021) (Kavanaugh, J., concurring). The following example is particularly apt for this appeal:

> Suppose that an elderly man is uncharacteristically absent from Sunday church services and repeatedly fails to answer his phone throughout the day and night. A concerned relative calls the police and asks the officers to perform a wellness check. Two officers drive to the man's

> home. They knock but receive no response. May
> the officers enter the home? Of course.

*Id.* at 1605 (Kavanaugh, J., concurring); *accord United States v. Tepiew*, 859 F.3d 452 (7th Cir. 2017) (permitting police officers' warrantless entry into a home on the basis of a report from a child in the home that her one-year-old brother had sustained a head injury and had a puffy face).

The home entry in this case likewise falls into the heartland of emergency-aid situations. It is undisputed that Allton knew that (1) Eads and Gaetjens's doctor were unable to get in touch with Gaetjens; (2) the doctor's office called Eads because she was Gaetjens's emergency contact; (3) Eads was concerned that Gaetjens was experiencing a medical emergency; and (4) Gaetjens's mail and garbage were piling up.

If, as Justice Kavanaugh posits, failing to come to church and answer a phone provides an objectively reasonable basis for believing that an occupant needs emergency assistance, then this litany of concerning circumstances facing Allton more than provided him with the same. His warrantless entry of the Loves Park home thus did not violate the Fourth Amendment.

In response, Gaetjens makes much of the fact that Eads told Allton that she believed Gaetjens was at her Rockford home, not her Loves Park home. But that statement just gave Allton a reason to also look for Eads in her Rockford house; it in no way contradicted the above facts that gave Allton an objectively reasonable basis to enter the Loves Park home.

*B. The Condemnation*

"The exigent circumstances doctrine [also] allows officers to enter a home without a warrant … to address a threat to the

safety of law enforcement officers or the general public … ." *Caniglia*, 141 S. Ct. at 1603 (Kavanaugh, J., concurring) (citing, among other cases, *Michigan v. Clifford*, 464 U.S. 287, 293 & n.4 (1984)). Two precedents guide our analysis of whether Foley had an objectively reasonable basis for believing that a safety threat required him to condemn the Loves Park home without a warrant.

First, in *Wonsey*, building inspectors found thirty-two building code violations in the plaintiff's home. 940 F.3d at 398. Based on the "dangerous conditions" that those violations presented, the inspectors asked the police to help them with "emergency evacuations." *Id.* The police did so, and then faced a § 1983 suit from an evacuee for violating her Fourth Amendment rights. *Id.* We rejected that claim because the "police entered her house … to help with an evacuation given an immediate safety concern." *Id.* at 401.

Second, the Sixth Circuit addressed a similar scenario in *Flatford v. City of Monroe*, 17 F.3d 162 (6th Cir. 1994), which we find persuasive. There, police officers evacuated a residential apartment building after inspectors determined that it "posed an immediate danger to its occupants and the public" because of its dilapidated wooden structure and faulty electrical system. *Id.* at 171. The court determined that the officers were entitled to qualified immunity for this warrantless evacuation because they reasonably believed that their entry was justified by exigent circumstances. *Id.* And the court noted that "[t]he very point of the exigency exception under these circumstances is to allow immediate effective action necessary to protect the safety of occupants, neighbors, and the public at large." *Id.* at 170.

This case aligns with both *Wonsey* and *Flatford*. Allton reported to Foley that the home was so noxious that the police could not bear going in more than ten feet. Foley then probed the front door himself and smelled a stench that could "gag a maggot." These circumstances gave Foley a reasonable basis on which to conclude that the home's "conditions posed an immediate danger to its occupants and the public." *Id.* at 171. Thus his reflex to temporarily condemn the home and "protect or preserve life" from such danger did not violate the Fourth Amendment. *Mincey*, 437 U.S. at 392–93 (quoting *Wayne*, 318 F.2d at 212).

Gaetjens retorts that summary judgment on this claim is inappropriate because the condition of the home was put in dispute by the testimony of her friend, Joan Klarner, who testified that she did not believe the home posed a health risk when she visited it several hours before Defendants arrived. But Klarner's testimony doesn't directly dispute the state of the home as Defendants found it later on that day. More important, even if the home was not as bad as Allton made it out to be, Foley was nonetheless entitled to rely on Allton's statements about the condition of the home because Allton had superior information after entering the home moments earlier. *Cf. Flatford*, 17 F.3d at 170 ("[R]equiring officers to second guess the more informed judgment of a building safety inspector would hinder effective and swift action. Officers should, therefore, have wide latitude to rely on a building-safety official's expertise where that expert determination appears to have some basis in fact.").

### C. Confiscation of the Cats

Last, "[e]xigent circumstances may justify a warrantless seizure of animals" when an official reasonably believes that

the animals are in "imminent danger." *Siebert*, 256 F.3d at 657 (citing *DiCesare*, 12 F.3d at 977); *see also, e.g.*, *Commonwealth v. Duncan*, 7 N.E.3d 469, 471 (Mass. 2014) (finding exigent circumstances to seize dogs where the dogs were left out "in severely inclement winter weather" and "extremely emaciated"); *Hegarty v. Addison Cnty. Humane Soc'y*, 848 A.2d 1139, 1143 (Vt. 2004) (permitting the warrantless seizure of a horse where officer reasonably believed that the horse's "health was in jeopardy and that immediate action was required to protect her").

The imminent danger to animals here was plain—Gaetjens's thirty-seven cats could not be cared for in the Loves Park home because the condemnation placard prevented Gaetjens from entering the home for that purpose. Given this situation, the Animal Services officials' warrantless entry into the Loves Park home and the seizure of her cats did not violate the Fourth Amendment.

Gaetjens argues in rebuttal that regardless of whether Animal Services could seize her cats, they still violated the Fourth Amendment by using excessive force when doing so. Specifically, she alleges that the officials used a "cat grabber" that injured and ultimately killed the stud Calaio.

We have held before that "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (citing *Brown v. Muhlenberg Township*, 269 F.3d 205, 210–11 (3d Cir. 2001)). But that case, and the cases from this circuit applying its rule, involved officers shooting dogs with firearms. This case involved Animal Services officials using a cat-catching tool to catch a cat (which, according to indisputable testimony, looked ready to

"maul" the cat-catcher). That Calaio died as a result of this manifestly reasonable tactic is unfortunate, but it does not an unreasonable seizure make.

Gaetjens also argues that even if the initial seizure of her cats was lawful, Animal Services violated her Fourth Amendment rights by retaining the cats longer than necessary. This argument fails because we have made clear that the Fourteenth Amendment, not the Fourth Amendment, provides the appropriate basis for challenging post-seizure procedures for the retrieval of property. *Bell v. City of Chicago*, 835 F.3d 736, 741 (7th Cir. 2016).

As a final note, Gaetjens argues that the district court incorrectly granted summary judgment *sua sponte* to the Animal Services officials. While Gaetjens is correct that this procedure warrants caution, it is permissible when "the losing party is given notice and an opportunity to come forward with its evidence." *Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Goldstein v. Fid. and Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750 (7th Cir. 1996)). Gaetjens has not argued here that she received inadequate notice, nor has she shown that she was deprived of an opportunity to marshal evidence to dispute the facts relied on in this opinion.

We therefore conclude that the Animal Services workers, like the other individual defendants, did not violate Gaetjens's Fourth Amendment rights.

*D.* Monell *Liability*

According to the Supreme Court's decision in *Monell*, municipalities are sometimes liable for the constitutional violations that their employees commit. 436 U.S. at 658. "But a

municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) (citing *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007)). That's the case here. Gaetjens's constitutional rights were not violated, and thus her *Monell* claim cannot succeed.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.